Keith L. NIETERT and Paula Nietert,
Plaintiffs-Appellants,

v.

Margaret Rose OVERBY,
Defendant-Appellee.

No. 84–1049.

United States Court of Appeals,
Tenth Circuit.

April 22, 1987.

Charles J. Haase, Colorado Springs, Colo., for plaintiffs-appellants.

Nancy E. Rice, Asst. U.S. Atty. (Robert N. Miller, U.S. Atty., and Colleen L. Conlin, Asst. U.S. Atty., on brief), for defendant-appellee.

Before HOLLOWAY, Chief Judge, and SEYMOUR and ANDERSON, Circuit Judges.

SEYMOUR, Circuit Judge.

Keith Nietert sued Margaret Overby for defamation in connection with Overby's call to a government "fraud, waste, and abuse" telephone hotline. She alleged misconduct by Nietert. After a bench trial, the district court held that Overby was entitled to official immunity. We affirm.

## I.

Keith Nietert and Margaret Overby were both civilian employees of the Army and Air Force Exchange Service (AAFES) at the times relevant to this suit. The AAFES is a nonappropriated fund instrumentality within the Department of Defense. Nietert was manager of the AAFES service station at the United States Air Force Academy in Colorado from 1971 until early 1982. He supervised Overby while she was employed as a sales clerk at the service station from March 1979 until November 1981. In November 1981, a confrontation occurred during which Nietert apparently indicated his intention to fire Overby. Overby subsequently transferred to a warehouse position at the Main Base Exchange at the Academy.

Since 1979, the AAFES has maintained a "hotline" program for reporting suspected fraud, waste, and abuse within the agency. The toll-free hotline is available to anyone in the United States, whether or not an AAFES employee. The AAFES actively encourages use of the hotline to report suspected illegal or improper activity to the Security Branch of the AAFES. *See* rec., vol. I, at 10–16; *id.*, supp. vol. III, at 5.

On December 7, 1981, Overby called the AAFES hotline anonymously and alleged that Nietert had committed various acts of misconduct, including theft, acceptance of gratuities, and improper use of the service station facilities. The call triggered an investigation, which eventually led to Nietert's sixty-day suspension without pay. Overby also made similar allegations against Nietert in a written report to Air Force agents during their investigation. None of the acts of misconduct charged by Overby served as the basis of Nietert's suspension.

Nietert originally brought this suit against Overby in state court, alleging that her statements were false and constituted defamation. The case was removed to federal district court. At the conclusion of the trial, the court held that Overby was entitled to absolute immunity from the common law tort claim of defamation. Nietert contends on appeal that Overby is not entitled to immunity because Overby's motive was solely to slander him, her actions were not discretionary, and his interest in recovery for his injury outweighs the govern-

ment's interest in the context of this case. Although we view this as a close case, we affirm the district court's order.

## II.

■ The Supreme Court has recognized that a federal official may enjoy absolute immunity from common law tort liability for acts committed within the outer perimeter of his or her line of duty. *See Barr v. Matteo,* 360 U.S. 564, 572, 575, 79 S.Ct. 1335, 1340, 1341, 3 L.Ed.2d 1434 (1959); *Howard v. Lyons,* 360 U.S. 593, 597, 79 S.Ct. 1331, 1333, 3 L.Ed.2d 1454 (1959); *see also Preble v. Johnson,* 275 F.2d 275, 278 (10th Cir.1960). In *Barr,* the Court held that an official's action of issuing a press release announcing why he intended to dismiss two subordinates "was an appropriate exercise of discretion" and thus fell within the scope of the officer's duties. *Barr,* 360 U.S. at 574, 79 S.Ct. at 1341. The Court also recognized that the decision whether to grant immunity necessarily involves balancing "the protection of the individual citizen [from] pecuniary damage[s]" caused by the wrongful action of federal officials, against "the protection of the public interest by shielding responsible governmental officers [from] the harrassment and inevitable hazards of vindictive or ill-founded damage suits brought on account of action taken in the exercise of their official responsibilities." *Id.* at 565, 79 S.Ct. at 1336.

In *Strothman v. Gefreh,* 739 F.2d 515, 517–18 (10th Cir.1984), this court discussed the doctrine of "official immunity" as set forth in *Barr* and subsequent cases. We noted that our essential task in considering immunity claims is to conduct "a careful inquiry into the nature of the alleged wrongful acts and scope of the accused official's duties," *id.* at 518 (quoting *Jackson v. Kelly,* 557 F.2d 735, 736 (10th Cir. 1977)), and to consider whether granting immunity promotes the policies underlying the *Barr* doctrine, *id.* at 519. To facilitate this inquiry, this court uses a three-fold test:

"(1) whether the defendant was acting within the scope of [her] official duties; (2) whether the act complained of involved the exercise of judgment or discretion; and (3) whether a grant of absolute immunity under the circumstances of the case would further the policies underlying the official immunity doctrine."

*Id.* at 518.

### A.

We first examine whether, for purposes of immunity, Overby was acting within the scope of her official duties when she made the allegedly defamatory statements about Nietert. We agree with the district court that she was.

■ The "scope" of an official's duty is not narrowly defined. *See Preble,* 275 F.2d at 278. An act will fall within the official's scope of authority if it "bear[s] some reasonable relation to and connection with the duties and responsibilities of the official," *Scherer v. Brennan,* 379 F.2d 609, 611 (7th Cir.), *cert. denied,* 389 U.S. 1021, 88 S.Ct. 592, 19 L.Ed.2d 666 (1967), and is not manifestly or palpably beyond the official's authority, *see Norton v. McShane,* 332 F.2d 855, 859 (5th Cir.1964), *cert. denied,* 380 U.S. 981, 85 S.Ct. 1345, 14 L.Ed.2d 274 (1965). In *Sowders v. Damron,* 457 F.2d 1182, 1185 (10th Cir.1972), we recognized that "whether the acts complained of were within the agent's course of duty [is] a question of law." *See also Chavez v. Kelly,* 364 F.2d 113, 114 (10th Cir.1966). Nevertheless, our determination requires careful examination of the facts.

In the present case, the district court found that Overby's hotline call was made "within the context of interaction involving governmental responsibility" and was connected to a government interest in preventing fraud, waste, and abuse. Rec., supp. vol. III, at 10. The court concluded that Overby was thus "acting within the outer perimeter of her responsibilities as a clerk in the service station." *Id.* at 9. The record supports this conclusion.

■ The AAFES service manual states that "[a]ll AAFES employees ... are required to report all incidents of misconduct

or irregularities involving AAFES operations." Rec., vol. I, at 13. Nietert concedes that the AAFES hotline program actively encourages anonymous tips to AAFES security headquarters. Appellants' Opening Brief at 4. Although Overby's allegations did not form the basis for Nietert's eventual sixty-day suspension, all of her statements related to AAFES operations and to Nietert's alleged conduct as the AAFES service station manager. In addition, Overby's statements were all made pursuant to the hotline reporting procedure or to AAFES investigators; no "public" channels were used. In *Preble*, we suggested that "federal servants [have] a clear duty to report to proper authorities causes of disruption in the services they perform." *Preble*, 275 F.2d at 278. Overby's statements, made through official channels, pertaining to AAFES government operations, and in the context of a program that actively encourages reporting misconduct or irregularities were thus "within the outer perimeter of [her] line of duty." *Barr*, 360 U.S. at 575, 79 S.Ct. at 1341.

Nietert's contention that Overby did not make her accusations in the interest of government control of fraud, waste, and abuse, but solely to slander him, does not take her actions out of her scope of duty nor defeat immunity. In *Spalding v. Vilas*, 161 U.S. 483, 486, 498–99, 16 S.Ct. 631, 632, 637, 40 L.Ed. 780 (1896), and in *Barr*, 360 U.S. at 575, 79 S.Ct. at 1341, the Supreme Court granted absolute immunity to the defendant officials despite allegations of malice. *See also Norton*, 332 F.2d at 858–59 (allegations of malice are not sufficient to prevent the application of immunity).

### B.

Because Overby's actions fell within the scope of her employment, we must apply the discretionary function test, as announced in *Jackson v. Kelly*, 557 F.2d at 737. Nietert contends that the district court did not properly apply the discretionary function test and that Overby is not entitled to immunity because she had no discretionary authority as a sales clerk. Additionally, Nietert suggests that if the AAFES *required* employees to report fraud, waste, and abuse, then Overby's actions were not "discretionary" and the immunity defense fails.

In *Jackson v. Kelly*, we recognized the significance of determining whether the conduct claimed to be immune involved the exercise of discretion. *Id.* at 737. An official whose duties require exercising broad discretion and judgment will necessarily be entitled to greater protection than one whose job entails little or no discretion. *Compare Chavez v. Singer*, 698 F.2d 420, 422 (10th Cir.1983) (no immunity; at most, discretion was minimal), ·*with Garner v. Rathbun*, 346 F.2d 55, 57 (10th Cir.1965) (immunity granted; duties "constantly demanded the exercise of judgment and discretion"). Discussing this element of the immunity analysis, we stated in *Jackson* that "[g]enerally speaking, a duty is discretionary if it involves *judgment*, planning, or policy decisions." 557 F.2d at 737 (emphasis added).

In the present case, although Overby's duties clearly involved very minimal discretion, we conclude that use of the AAFES hotline sufficiently required judgment or discretion to warrant the protection of immunity. Making the hotline report necessarily involved some judgment in deciding what actions by Nietert might constitute "misconduct or irregularities." This is true whether or not the AAFES considers it a mandatory duty of employees to report fraud, waste, and abuse. A report of misconduct cannot be a purely ministerial act, or even the "administration of a mandatory duty at the operational level," *see id.* at 737, when the person reporting is the same person who decided that the circumstances warranted the report, and when there is no "fixed or readily ascertainable standard," *see Strothman*, 739 F.2d at 519, for making that determination. The AAFES requirement that employees report "misconduct or irregularities" does not, in our view, set a fixed or readily ascertainable standard. Thus, although Overby's job as a sales clerk involved only

very limited discretion, we think the district court correctly concluded that her act of making the hotline report was "discretionary."

### C.

We next consider whether granting absolute immunity in this case would further the policies underlying the official immunity doctrine. Although this question is not easily resolved, we conclude that the policies favoring immunity outweigh Nietert's individual interests. Under the circumstances, the effective functioning of government requires that federal employees be free to report suspected "fraud, waste, and abuse" through official channels and pursuant to reporting programs, without fear of personal liability. *See id.* at 520.

In weighing the various policy considerations, the Supreme Court "has advised a discerning inquiry into whether the contributions of immunity to effective government in [this] particular context[ ] outweigh the perhaps recurring harm to individual citizens." *Doe v. McMillan,* 412 U.S 306, 320, 93 S.Ct. 2018, 2028, 36 L.Ed.2d 912 (1973). Immunity cases inevitably involve a clash between policies favoring the important right of individuals to be compensated for injuries, *see Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803), and those protecting the public interest and promoting the effective functioning of government, *see Strothman,* 739 F.2d at 517–18, 520. *See also Barr,* 360 U.S. at 565, 571, 79 S.Ct. at 1336, 1339; *Expeditions Unlimited Aquatic Enters., Inc. v. Smithsonian Inst.,* 566 F.2d 289, 292 (D.C.Cir.1977), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978); *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949), *cert. denied,* 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950).

▊ In the present case, a balancing of these interests weighs in favor of granting immunity. In *Strothman,* we recognized the "substantial public benefit that derives from the uninhibited internal scrutiny of government agencies." 739 F.2d at 520. The AAFES hotline program is designed to permit such "internal scrutiny" through a combination of employee reporting and follow-up investigations by security officers. In the absence of immunity, employees would be inhibited from making reports of suspected "fraud, waste, or abuse" by the risk of being sued for defamation. Even a report made with a reasonable belief that misconduct has occurred could easily become the subject of a lawsuit if an investigation reveals that the belief and statements were erroneous. The AAFES manual requires employees to report "misconduct *or irregularities.*" *See* rec., vol. I, at 13 (emphasis added). Irregularities may or may not subsequently be deemed culpable misconduct. It should be the job of investigative personnel—not the general employees—to determine whether claims or suspicions of misconduct have merit. Exposing AAFES employees to liability for statements made through the hotline would discourage rather than encourage the reporting of fraud, waste, and abuse.

Our result in this case is also supported by explicit federal policies. In a related context, Congress has recognized that employee-reporting or "whistleblowing" programs serve to promote effective government, and has enacted laws to protect "whistleblowers" from employment-related reprisals for reporting fraud, waste, and abuse. *See, e.g.,* 5 U.S.C. § 2302(b)(8) (1982); 10 U.S.C.A. § 1587(b) (West Supp. 1986). When Congress extended this protection to employees of nonappropriated fund instrumentalities such as the AAFES, the Senate committee reporting the bill recognized that "the majority of cases of corruption, bribes, and kickbacks are uncovered through information volunteered by concerned employees.... The [Senate] Committee believes that [protecting such employees] will enhance ongoing government efforts to uncover and deter illegal and unethical practices." S.Rep. No. 174, 98th Cong., 1st Sess. 252, *reprinted in* 1983 U.S.Code Cong. & Admin.News 1081, 1142. Granting official immunity from common law defamation claims to federal employees who report suspected misconduct through official channels is consistent

with these congressional policies and findings.

Finally, the sphere of protected activity—hotline reports and statements made to government investigators—is "related closely" to the immunity's justifying purposes. *See Nixon v. Fitzgerald,* 457 U.S. 731, 755, 102 S.Ct. 2690, 2704, 73 L.Ed.2d 349 (1982); *cf. McKinney v. Whitfield,* 736 F.2d 766, 770 (D.C.Cir.1984). This case involves allegations of defamation with respect to internal reports. Overby's statements were made through official AAFES channels and were related to AAFES operations.

We conclude that the balance of policy considerations in the present context weighs in favor of granting immunity. As Judge Learned Hand wrote for the court in *Gregoire v. Biddle,*

"There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation."

177 F.2d at 581, *quoted in Barr,* 360 U.S. at 571–72, 79 S.Ct. at 1339–40.

AFFIRMED.