Catherine **ROBINSON**, Plaintiff,

v.

Jack **EGNOR**, Defendant.

Civ. A. No. 88–0380–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Nov. 22, 1988.

Diane C. Gravis, Falls Church, Va., for plaintiff.

Paula Newett, Asst. U.S. Atty., Alexandria, Va., for defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

### Introduction

This defamation suit raises personal jurisdiction and immunity issues, the latter ultimately proving dispositive. Specifically, plaintiff Catherine Robinson, a United States Marshals Service employee and a Virginia citizen, claims Defendant Jack Egnor, United States Marshal for Colorado and a Colorado citizen, defamed her character in several telephone calls he made to persons in Illinois and Virginia. Egnor, in response, argues that this Court's exercise of personal jurisdiction over him is statutorily and constitutionally inappropriate. He asks, therefore, that Robinson's case be dismissed or that it be transferred to the District of Colorado.[1] In the alternative, Egnor moves for Summary Judgment, claiming he is entitled to absolute immunity.

---

1. Defendant's transfer motion is denied. Under 28 U.S.C. § 1404(a), defendant bears a substantial burden to show that "the convenience of parties and witnesses" and "the interest of justice" require upsetting plaintiff's forum choice. *See, e.g., Milliken & Co. v. F.T.C.,* 565 F.Supp. 511 (D.S.C.1983); *Medicenters of America, Inc. v. T & V Realty & Equip. Corp.,* 371 F.Supp. 1180 (E.D.Va.1974) (strong showing required for transfer). No such showing has been made. Transfer is inappropriate where, as here, it would merely shift the inconvenience from one party to another or shift slightly the balance of equities. *See Quinn v. Bowmar Publishing Co.,* 445 F.Supp. 780 (D.Md.1978); *See generally* Annotation, *Questions as to Convenience and Justice of Transfer Under Forum Non Conveniens Provision of Judicial Code* (28 U.S.C. § 1404(a)), 1 A.L.R.Fed. 15 (1969).

This matter is before the Court on defendant's motion to dismiss, pursuant to Rule 12(b)(2), Fed.R.Civ.P., for lack of personal jurisdiction and defendant's motion to dismiss or, in the alternative, for summary judgment on the ground of absolute immunity. The parties argued the motions orally and the Court took the matter under advisement pending submission of answers to interrogatories pertinent to the issues raised by the motions. While the record, not surprisingly, discloses some disputed facts as·to the alleged defamation, these disputes do not affect resolution of the personal jurisdiction or immunity issues. For the reasons stated herein, the Court concludes that personal jurisdiction over Egnor is appropriate, but that Egnor is entitled to immunity. It therefore grants Egnor's motion for summary judgment.

## Facts

Robinson is Program Manager for the Court Security Division of the United States Marshals Service. She works at Marshals Service Headquarters in Arlington, Virginia.[2] Robinson is responsible for hiring and supervising approximately 1,200 Court Security Officers ("CSOs"). CSOs help protect the federal judiciary in the United States' ninety-three judicial districts.[3] They are hired from independent security companies. Robinson develops criteria for the selection and training of CSOs and reviews contract proposals submitted by security companies offering to furnish CSOs. Robinson also serves as a liaison between the Marshals Service and the security companies.

Among the contractors plaintiff deals with on a regular basis is Aegis Services, Ltd. ("Aegis"). Headquartered in Chicago, Aegis is the private security guard company the government selected to provide CSOs for the District of Colorado. James Griffiths, who works in Chicago, is Aegis' administrative manager for the Denver security contract. Donald Woods is Aegis' on-site supervisor for CSOs in Denver. Griffiths is Woods' supervisor. Robinson's duties include evaluating the performance of Aegis employees, including Woods, and discussing their status with Aegis administrators.

Defendant Egnor has served as United States Marshal for the District of Colorado since March 9, 1987. In that capacity, Egnor is responsible, *inter alia,* for security at the U.S. Courthouse in Denver, Colorado. Prior to the incidents complained of here, Egnor had encountered continuing administrative problems with respect to Aegis' contract performance. These problems related to the inability of Woods and Marshals Service employees to work together. On February 8, 1988, Woods and a supervisory Deputy Marshal had a disagreement about the physical placement of guards inside the courthouse. The Deputy Marshal informed his immediate superior, Chief Deputy United States Marshal Charles Papaccio, of this disagreement. On February 11, 1988, Papaccio telephoned Robinson in Virginia to report the problem and to seek her advice.

According to Egnor, on February 11, 1988—the same day as Papaccio's phone call to Robinson—a CSO in Denver told a Deputy Marshal there that Robinson had attempted to contact Woods about Papaccio's complaints. Such communications, if they occurred, would be highly unusual. This CSO also stated that Robinson and Woods were involved in a dating relationship. The Deputy Marshal told Papaccio the substance of his conversation with the CSO. Papaccio, in turn, told Egnor.

**2.** At the times here in issue the Marshals Service Headquarters was located in McLean, Virginia. It has since moved to Arlington, Virginia. This move has no bearing on the resolution of this dispute.

**3.** The United States Marshals Service is responsible for providing for the protection and security of federal judges, courtrooms and courthouses. *See* 28 C.F.R. § 0.111(d) (1988). To better fulfill this responsibility, the General Service Administration has delegated to the Marshals Service through the Attorney General the authority to contract for private security guard services for judicial areas and perimeter security in United States courthouses. These services are obtained through the competitive bidding process; they are paid for by a transfer of funds from the Administrative Office of the United States Courts to the Marshals Service.

In response to these allegations, Egnor telephoned Griffiths in Chicago. He told Griffiths that the Marshals' office in Denver was having problems with Woods. He also told Griffiths that he had heard that Woods and Robinson had a dating relationship. In Egnor's view, this allegation, if true, would present a conflict of interest. According to Griffiths, Egnor told him that the relationship between Robinson and Woods was intimate. Griffiths claims he informed Egnor that, to his knowledge, Robinson and Woods had only met once, and Woods had only infrequent telephone conversations with Robinson. Griffiths claims that Egnor nonetheless insisted that Woods and Robinson had an intimate relationship. The next morning, Egnor called Griffiths again and said he was going to speak with Robinson's superiors about the potential conflict of interest. That same day, Egnor called Ralph Zurita, Chief of the Court Security Division and Robinson's immediate superior, at Marshals Service Headquarters. During this phone conversation, Egnor told Zurita of the allegation that Robinson was intimately involved with Woods. Egnor told Zurita that, if true, this situation would present a conflict of interest for Robinson. Zurita investigated the allegation, concluded it was unfounded and called Egnor to report this. Robinson claims that Egnor's telephone calls to Griffiths and Zurita were defamatory.

Pertinent to the threshold jurisdictional issue are the number and nature of Egnor's Virginia contacts. They are, for clarity, enumerated below:

(1) Egnor has twice visited Virginia on Marshals Service business. In April 1987, Egnor visited Virginia for a two-day orientation meeting for new Marshals. In October 1987, Egnor spent two days in Virginia attending the Marshals Service Awards Ceremony. During his second visit to Virginia, Egnor met with Zurita;

(2) During his nineteen month tenure as Marshal, Egnor estimates he has written or telephoned one or another of the twenty-four Marshals Service departments in Virginia once or twice per month.[4] These contacts are in addition to those giving rise to this action and in addition to those specifically identified in the remaining numbered paragraphs here. In approximate quantitative terms, therefore, it appears that Egnor has had, over the nineteen month period, at least fifty contacts with the Marshal Service's Virginia headquarters:

(3) Egnor has spoken by telephone with employees of the Court Security Division in Virginia six times;

(4) Egnor has sent two letters to the Court Security Division in Virginia;

(5) Egnor has spoken by telephone with John Twomey, Deputy Director of the Marshals Service in Virginia, either three or four times;

(6) Egnor has spoken by telephone several times with Joseph Lazar in the Marshals Service Office of General Counsel located at the Virginia Headquarters;

(7) Egnor has also spoken once or twice by telephone with Lawrence Dieffenback of the United States Marshals Service in Virginia;

(8) Egnor has spoken with Robinson once, on January 10, 1988. On February 4, 1988, Egnor followed up this conversation with a memorandum mailed to Robinson in Virginia.

In a more general sense, it is worth noting that while Egnor exercises some independence in directing his Colorado office, he follows the policies set by Headquarters, uses its support services and generally cooperates with Headquarters in the management of his Colorado personnel. Headquarters in Virginia also handles the hiring and dismissal of deputy marshals in Colorado and elsewhere. Finally, Egnor also works with Headquarters on various financial matters, including Headquarters' allocations for the payment of overtime and travel expenses for deputy marshals.

---

**4.** *See* Defendant's Response to Plaintiff's First Set of Interrogatories ¶ 8 ("I have had infrequent contacts with offices set forth in this Interrogatory with the exception of what I have set forth in my previous answers. I would estimate that I may have contacted any one of the offices described above once or twice a month.").

## Analysis

### A. Personal Jurisdiction

■ Personal jurisdiction analysis is a two-step process: First, this Court must determine whether the Virginia long-arm statute authorizes the exercise of personal jurisdiction. Put another way, the question is whether the statute's terms reach the defendant. Second, if the statutory requirements are met, this Court must then determine whether the assertion of personal jurisdiction comports with the Due Process Clause. In other words, the inquiry in the second step is whether the statute's reach in this instance exceeds its constitutional grasp. *See Blue Ridge Bank v. Veribanc,* 755 F.2d 371, 373 (4th Cir.1985); *Peanut Corporation of America v. Hollywood Brands, Inc.,* 696 F.2d 311, 313 (4th Cir.1982) (citing *Haynes v. James H. Carr, Inc.,* 427 F.2d 700, 703 (4th Cir.), *cert. denied,* 400 U.S. 942, 91 S.Ct. 238, 27 L.Ed. 2d 245 (1970)); *Eastern Scientific Marketing v. Tekna–Seal, Inc.,* 696 F.Supp. 173 (E.D.Va.1988). Robinson bears the burden of demonstrating jurisdiction once the existence of personal jurisdiction has been questioned. *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 182, 56 S.Ct. 780, 782, 80 L.Ed. 1135 (1936); *Haynes,* 427 F.2d at 704.

Robinson claims Subsection A(4) of Virginia's long-arm reaches Egnor here. That subsection provides:

> A. A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's:
>
> . . . . .
>
> 4. Causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in Virginia.

Va.Code § 8.01–328.1(A)(4) (Cum.Supp. 1988). The exercise of long arm jurisdiction under this subsection has two requirements: "(1) a tortious injury in Virginia caused by an act or omission outside of Virginia; and (2) a relationship between the defendant and the Commonwealth which exists in any one of three ways which are specified in § 4." *Blue Ridge Bank,* 755 F.2d at 373.

Virginia's long arm statute has been extended to the limits of due process.[5] Still, jurisdiction under Subsection (4) requires the Court to find that the specific statutory requirements are met "even in those situations where it could plausibly be argued that a lesser standard would meet due process" inasmuch as "insistence that these particulars be satisfied ... is a course mandated by legislative judgment." *Willis v. Semmes, Bowen & Semmes,* 441 F.Supp. 1235, 1243 (E.D.Va.1977); *see also Blue Ridge Bank,* 755 F.2d at 371.

Robinson has demonstrated facts sufficient to meet the first portion of Subsection (4): an act outside Virginia which allegedly caused an injury in Virginia. *See First American First, Inc. v. National Association of Bank Women,* 802 F.2d 1511, 1514 (4th Cir.1986) (allegedly defamatory letters mailed to Virginia constitutes tortious injury within Virginia caused by act committed elsewhere). Indeed, Egnor does not dispute that this requirement has been met. He argues, however, that Robinson has not met Subsection (4)'s second requirement: a "persistent course of conduct" directed toward the Commonwealth.

*Willis v. Semmes, Bowen & Semmes,* 441 F.Supp. 1235 (E.D.Va.1977), is instructive in determining what is a "persistent course of conduct." In *Willis,* a Virginia client sued a Maryland law firm for converting a note. In that court's view, jurisdiction for the conversion count turned ultimately on whether the record disclosed that the law firm had engaged in a "persistent course of conduct" in connection with Virginia. After analyzing this statu-

---

5. *John G. Kolbe, Inc. v. Chromodern Chair, Co.,* 211 Va. 736, 750, 180 S.E.2d 664, 667 (1971) (purpose of Virginia's long-arm statute is to assert jurisdiction over nonresidents who engage in some purposeful activity in this State to extent permissible under due process clause); *accord Carmichael v. Snyder,* 209 Va. 451, 164 S.E.2d 703, 707 (1968).

tory phrase and its interaction with the subsection's alternative requirements, the court concluded that "[a]t a minimum, the plaintiff must prove that the defendant maintained some sort of ongoing interaction with the forum state." *Id.* at 1242. Since defendant's contacts with Virginia had ceased two years prior to the alleged conversion, the court found that the plaintiff had not demonstrated "persistent conduct" on its conversion claim. *Id. Security Bank, N.A. v. Tauber,* 347 F.Supp. 511 (D.D.C.1972), analyzing the virtually identical D.C. long-arm statute,[6] also makes clear that the key to "persistent course of conduct" is the ongoing nature of the conduct:

this Court is impressed with the apparent Congressional intent to confine the minimum contacts set out in [Subsection A(4)] of the statute to those contacts which are continuing in nature. The use of "persistent" and "regularly" to describe the type of contact contemplated indicates that Congress was more concerned with a continuing contact than with the impact or substance of a single contact.

*Id.* at 515.

One commentator suggests that regularly advertising in Virginia and distributing catalogues and goods in Virginia would constitute "a persistent course of conduct." *See* Note, *The Virginia "Long Arm" Statute,* 51 Va.L.Rev. 719, 749 (1965). This commentator also suggests that "Virginia Courts should take a nonrestrictive, liberal view of the conditions in subsection (4).... [S]uch a construction would offer a nice balance between the legislative intent to expand jurisdiction on the one hand and the policy of avoiding inconvenience to a defendant who has had only a fortuitous con-

tact with the state upon the other." *Id.* Nor is it necessary that the contacts with Virginia be related to the cause of action alleged.[7] In sum, to qualify as a "persistent course of conduct," contacts must be ongoing or continuous in nature, but need not be related to the matter in suit.

Egnor's ongoing contacts with Virginia clearly qualify under this standard; they are sufficient to demonstrate a "persistent course of conduct." Since becoming United States Marshal for Colorado, Egnor has visited Virginia twice in his official capacity. More importantly, he communicates with Marshals Service Headquarters in Virginia on an ongoing basis. Conservatively, Egnor's contacts with Marshals Service Virginia Headquarters total at least fifty (and very likely more) during his brief tenure. Moreover, these contacts will continue, because Egnor relies on Marshals Service Headquarters for the hiring and termination of CSOs and deputy marshals, and for the establishment and distribution of his district's budget. In sum, it is unmistakably clear that Egnor's management responsibilities require that he communicate with Headquarters on a regular basis.

*Blue Ridge Bank v. Veribanc,* 755 F.2d 371 (4th Cir.1985) confirms that Egnor's contacts are sufficient to satisfy Subsection (4). There, a Virginia banking corporation sued a Massachusetts corporation for defamation. Veribanc, the Massachusetts Corporation, analyzed financial information sent to the Federal Reserve Board from banks throughout the country. It then distributed its analyses to its customers, who consisted mainly of money market and cash managers. From June 1982 to November 1983, Veribanc received fifty-seven orders

6. Both statutes are derived from Section 1.03 of the Uniform Interstate and International Procedure Act. Unif. Interstate & Int'l P. Act § 1.03, 13 U.L.A. 361 (1962). *Security Bank's* analysis of the "persistent course of conduct" language in the District's long-arm statute is therefore therefore in construing the identical language in Virginia's long-arm statute.

7. This point is well expressed in the Uniform Laws comments:

It should be noted that the regular solicitation of business or the persistence course of con-

duct required by [the statute] need have no relationship to the act or failure to act that caused the injury.... In sustaining the exercise of jurisdiction over a defendant who has caused injury in the state by means of a tortious act done outside the state, the courts have often emphasized that the defendant had contacts with the state that bore no relation to the particular tort.

Unif. Interstate & Int'l P. Act § 1.03, 13 U.L.A. 363 (1962) (official comments). *See also Blue Ridge Bank,* 755 F.2d at 374.

from Virginia, 1.16 percent of its total orders, and earned $2,539 from its Virginia orders. Based on its analysis of the data, Veribanc concluded that Blue Ridge faced zero equity within 12 months. Veribanc then sold this particular information to a syndicated financial columnist who published it in the *Richmond Times Dispatch.* The article, at Veribanc's insistence, gave Veribanc credit for the financial analysis. On these facts, Veribanc challenged personal jurisdiction and prevailed in the trial court. On appeal, the Fourth Circuit reversed. It found jurisdiction under Subsection (4) of the Virginia long-arm statute. Blue Ridge had demonstrated a tortious injury in Virginia by an act outside of Virginia and a persistent course of conduct by Veribanc.

> From June 16, 1982, the date of Veribanc's incorporation, through November 30, 1983, a seventeen month period, Veribanc received fifty-seven orders for its analyses from customers in Virginia. On each occasion, Veribanc sent its analyses to the Virginia customer who then sent payment to Veribanc. Furthermore, Veribanc instructed Dan Dorfman to include its name and location in his article. From these facts we conclude that Veribanc has engaged in a persistent course of conduct in Virginia.

*Id.* at 373–74.

*Veribanc* makes clear that what is jurisdictionally significant is not merely the number of contacts, but the continuing or ongoing nature of these contacts.[8] Egnor's contacts with Virginia, like Veribanc's, are consistent and ongoing; they reflect the requisite persistent course of conduct. It follows, therefore, that here, as in *Veribanc*, the Virginia long-arm stat-

ute authorizes the exercise of jurisdiction over defendant.

■ Equally clear is the absence of any unconstitutional overreaching; personal jurisdiction over Egnor pursuant to Subsection (4) does not offend due process. Egnor's ample contacts with Virginia are such that subjecting him to trial in Virginia "does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). The interest to be protected is Egnor's liberty interest in not being subjected to trial in Virginia if he has no meaningful contacts, ties or relations with Virginia. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 468, 105 S.Ct. 2174, 2180, 85 L.Ed.2d 528 (1985). In addition, Robinson must demonstrate that Egnor purposefully availed himself of the privilege of conducting activities in Virginia such that he would "reasonably anticipate being haled into court" here. *World–Wide Volkswagon Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

*First American First, Inc. v. National Association of Bank Women,* 802 F.2d 1511 (4th Cir.1986), analyzes whether the exercise of statutory jurisdiction under Subsection (4) of Virginia's long arm statute offends due process. That court concluded that the assertion of jurisdiction under Subsection (4) is an assertion of specific jurisdiction. *Id.* at 1516–17.[9] Jurisdiction under Subsection (4) therefore does not require the "systematic and continuous contacts" needed for the constitutional exercise of general jurisdiction. *Id.* The reason for this is Virginia has a legitimate interest in providing a forum for claims based on conduct causing harm within its borders. In addi-

---

8. *See also First American First, Inc. v. National Association of Bank Women,* 802 F.2d, 1511, 1514–15 (4th Cir.1986) (bi-monthly mailings of organization journal and annual mailings of membership directory to 1,150 Virginia members demonstrate "ongoing interactions" and hence a persistent course of conduct with Virginia).

9. Specific jurisdiction is jurisdiction based on the contacts with the forum which form the

basis of the cause of action. General jurisdiction is jurisdiction based on defendant's contacts with the forum without regard to whether these contacts form the basis of the cause of action. *See Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414 nn. 8–9, 104 S.Ct. 1868, 1872 nn. 8–9, 80 L.Ed.2d 404 (1984); *Eastern Scientific Marketing v. Tekna–Seal,* 696 F.Supp. 173, 178 n. 8 (E.D.Va.1988).

tion, an out-of-state defendant should reasonably expect to appear before a Virginia court when his "purposefully targeted conduct" has caused harm in Virginia. *First American First,* 802 F.2d at 1516.

Robinson has demonstrated that the exercise of specific jurisdiction over Egnor here does not offend due process. Egnor made an allegedly defamatory telephone call to Virginia. The brunt of any harm was suffered in Virginia. *Calder v. Jones,* 465 U.S. 783, 789–90, 104 S.Ct. 1482, 1486–87, 79 L.Ed.2d 804 (1984), is dispositive. In *Calder,* the Supreme Court held that California's exercise of personal jurisdiction over two Florida journalists, who wrote and published an allegedly defamatory article in Florida, did not violate due process concerns because the article's effects were aimed at and suffered by a California citizen. The same reasoning and the same conclusion obtain here.[10]

Robinson, in summary, has established that the exercise of personal jurisdiction over Egnor satisfies both the requirements of Virginia's long arm statute and the requirements of due process. The Court, therefore, has personal jurisdiction over Egnor.

### B. *Immunity*

 Until November 18, 1988, the scope of federal employee immunity from common law tort claims was controlled by the Supreme Court's decision in *Westfall v. Erwin,* — U.S. ——, 108 S.Ct. 580, 98 L.Ed.2d 619 (1988). In *Westfall,* a unanimous court held that federal officials are absolutely immune from prosecution for state law torts if the activity is "within the

outer perimeter of an official's duties and is discretionary in nature." *Id.* 108 S.Ct. at 585. The *Westfall* opinion noted, however, "that Congress is in the best position to provide guidance for the complex and often highly empirical inquiry into whether absolute immunity is warranted in a particular context. Legislative standards governing the immunity of federal employees involved in state-law tort actions would be useful." *Id.* Congress accepted this invitation. It moved quickly to provide absolute immunity for federal officials whose activities fell within the scope of their employment. *See* 134 Cong.Rec S.15597 (daily ed. Oct. 12, 1988) (statement of Sen Thurmond). In effect, Congress expanded the immunity standard; it effectively eliminated the *Westfall* requirement that an official prove his acts were discretionary in nature.[11] Indeed, Congress chose to provide federal officials with absolute immunity for all acts within the scope of their employment. Plaintiffs' sole remedy now is a Federal Tort Claims Act suit against the United States. 28 U.S.C. § 2671 *et seq.* Thus, the new statute, the Federal Employees Liability Reform and Tort Compensation Act of 1988,[12] provides that

> [t]he remedy against the United States provided by [the Federal Tort Claims Act] for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment is exclusive of any other civil action....

28 U.S.C. § 2679(b)(1) (as amended November 18, 1988).[13]

---

**10.** The Court's conclusion that the exercise of personal jurisdiction over Egnor under these circumstances does not offend due process is supported by a number of other courts. *See, e.g., Brown v. Flowers Industries,* 688 F.2d 328, 334 (5th Cir.1982); *Froess v. Bulman,* 610 F.Supp. 332, 336–37 (D.R.I.1984), *aff'd without opinion* 767 F.2d 905 (1st Cir.1985); *Rusack v. Harsha,* 470 F.Supp. 285 (M.D.Pa.1978).

**11.** *See, e.g.,* 134 Cong.Rec. H4718, H4719 (daily ed. June 27, 1988) (statement of Rep. Moorehead) ("The *Westfall* decision from a practical viewpoint will now require a factual determination in every suit filed against any Federal em-

ployee to determine whether he or she used discretion in carrying out their acts before immunity will be found to exist. [This Act] addresses this issue by returning the state of the law back to where it was before the *Westfall* decision regarding Federal employees' liability.").

**12.** Signed into law by the President on November 18, 1988.

**13.** It is clear from the legislative history that Congress meant to limit plaintiffs to suits against the United States. For example, Senator Thurmond, in supporting the measure, stated

The Act applies "to all claims, civil actions, and proceedings pending on, or filed on or after, the date of the enactment of this Act." Federal Employees Liability and Tort Compensation Act of 1988 § 8(b). All that is required, therefore, to find Egnor absolutely immune from liability is a finding by this Court that Egnor's actions fell within the scope of his employment.[14] An act falls within an official's scope of authority if it (i) bears some reasonable relation to or connection with the duties and responsibilities of the official and (ii) is not manifestly or palpably beyond the official's authority.[15] In this case, Egnor's actions clearly fell within the scope of his official responsibilities. As United States Marshal for the District of Colorado, Egnor was responsible for courthouse security in Denver. In this connection, it was entirely appropriate for Egnor, as U.S. Marshal, to be concerned with issues raised by a CSOs supervisor's performance and to seek the assistance of Headquarters' liaison in this regard. It was also entirely appropriate for Egnor, as U.S. Marshal, to be concerned that reports of a dating relationship between the problem CSO supervisor and Headquarters' liaison supervisor might be true and hence create a conflict of interest for the supervisor in dealing with the problem. Whether Egnor's specific actions re-flect prudence or good judgment is debatable. Not debatable, however, is the conclusion that Egnor's concerns and actions were squarely within the scope of his authority; they bore a direct and reasonable relation to his duties and responsibilities. Accordingly, Egnor is entitled to absolute immunity under the new Act.

The same result would obtain even if *Westfall* still held sway. Under *Westfall,* absolute immunity only shielded discretionary acts of federal officials. *Westfall,* 108 S.Ct. at 585. Discretionary acts generally involve the exercise of judgment. *See Nietert v. Overby,* 816 F.2d 1464, 1467 (10th Cir.1987); *Strothman v. Gefreh,* 739 F.2d 515, 519 (10th Cir.1984). Egnor's acts here are clearly discretionary. Egnor, in the exercise of his official capacity, was required to exercise discretion in determining how to react to the information he received about Robinson, information that he reasonably believed impacted on court security in Colorado. Egnor decided to forward these allegations to Robinson's supervisor. Reporting a potential conflict of interest is a discretionary activity. *See Nietert v. Overby,* 816 F.2d at 1467 (reporting potential fraudulent abuse over toll-free hotline "necessarily involves some judgment in deciding what actions [by plaintiff] might constitute misconduct

that "[t]his bill ... will establish the Federal Tort Claims Act as the exclusive remedy for those injured by the negligence of a Federal Employee acting within the scope of employment." 134 Cong Rec S15597, S15598 (daily ed. Oct. 12, 1988) (statement of Sen. Thurmond). *See also* 134 Cong.Rec. S15597, S15599 (daily ed. Oct. 12, 1988) (statement of Senator Grassley) ("This bill amends the Federal Tort Claims Act to make a lawsuit against the United States under the FTCA the exclusive remedy for anyone injured by Government negligence.")

**14.** The United States Attorney has informed the Court that the Attorney General will certify that Egnor was acting within the scope of his employment as soon as possible. Attorney General certification would lead to the substitution of the United States as the party defendant to this action. *See* 28 U.S.C. § 2679(d) (as amended November 18, 1988). The Court has not yet received this certification and, having reached its decision, concludes that delaying resolution of this suit pending certification by the Attorney General is unnecessary. Worth noting, however, is that certification by the Attorney General would lead to the same result. Attorney General certification would cause the United States to be substituted as the party defendant to this action. The action would become a suit against the United States under the Federal Tort Claims Act. 28 U.S.C. § 2671 *et seq.* Under this Act, however, the United States is not liable for claims of libel, slander and the like. 28 U.S.C. § 2680(h). The end result would be summary judgment for the defendant—the same result which obtains here.

**15.** *See Nietert v. Overby,* 816 F.2d 1464, 1467 (10th Cir.1987); *Ricci v. Key Bancshares of Maine, Inc.,* 768 F.2d 456, 462 (1st Cir.1985) [quoting *Spalding v. Vilas,* 161 U.S. 483, 486, 16 S.Ct. 631, 632, 40 L.Ed. 780 (1896) ] ("The conduct in question need only be more or less connected to 'the general matters committed by law to [defendant's] control or supervision' and not 'manifestly or palpably beyond his authority.' "); *Martin v. D.C. Metropolitan Police Authority,* 812 F.2d 1425, 1429 (D.C.Cir.1985), *reh'g granted, vacated in part on other grounds,* 817 F.2d 144 (D.C.Cir.1987).

or irregularities"). In addition, conversations which are an integral part of an official's supervisory responsibilities are necessarily discretionary. *See Araujo v. Welch,* 742 F.2d 802, 805 (3rd Cir.1984) (participating in a discussion of work-related matters at an Army-sponsored Equal Employment Opportunity conference is within scope of defendant's discretionary powers, when defendant is responsible for supervision of local Equal Employment Opportunity office); *see also Scott v. DeMenna,* 840 F.2d 8 (11th Cir.1988) (in defamation suit by market news reporter, reporting market news held to be inherently discretionary activity).

Under *Westfall,* this Court would also consider whether absolute immunity, in the context at bar, would serve the purposes underlying the doctrine. This determination depends on a careful examination of the potential effect of liability on Egnor's performance of his official duties:

> Because the benefits of official immunity lie principally in avoiding disruption of governmental functions, the inquiry into whether absolute immunity is warranted in a particular context depends on the degree to which the official function would suffer under the threat of prospective litigation.

*Westfall,* 108 S.Ct. at 583 n. 3. The threat of litigation may not always act as a negative incentive. It may, in fact, encourage federal officials to act in strict accordance with the law. The danger, however, is that a federal official may not carry out his or her responsibilities or may act with an excess of caution to prevent liability. Such caution would handicap the effective administration of our government. *See Plowman v. United States Department of the Army,* 698 F.Supp. 627 (E.D.Va.1988).

In this case, absolute immunity plainly serves the purposes underlying the doctrine. Fear of prosecution under the circumstances presented here would provide perverse incentives to similarly situated officials. Egnor is responsible for the management and security of the United States courts in Colorado. He was informed (perhaps misinformed) of a poten-

tial conflict of interest. This potential conflict of interest impacted both on the management of the courthouse in Denver and the safety of courthouse personnel. To prevent Egnor from inquiring into these matters without fear of liability would in all likelihood lead to a perilous excess of caution in the carrying out of his official duties. It is precisely to protect workers who report potential misconduct of their fellow employees to their employers that "every state makes an exception of some kind [from suits for defamation] for communications to one's employer about a fellow worker, on the ground that the risk of liability would induce employees to keep an unfortunate silence." *Cross v. Fiscus,* 830 F.2d 755 (7th Cir.1987) (dicta). To make officials, like Egnor, liable for reporting potential misconduct of other federal officials would "skew their decisions in ways that result in less than full fidelity to the objective and independent criteria that ought to guide their conduct." *Forrester v. White,* — U.S. —, —, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988). Absolute immunity here manifestly supports the underlying goals of the doctrine.

 The Court does not here pass judgment on the appropriateness of Egnor's actions. There is no evidence that Robinson, in fact, had a relationship with Woods. It may well be that Egnor made a mistake in contacting Robinson's superior without further investigation. Absolute immunity, however, protects even mistaken judgments by public officials.

Accordingly, Egnor's Motion for Summary Judgment is Granted. An appropriate order will be entered.